THE GENERAL KNOX.

(District Court, D. Rhode Island. July 14, 1910.)

No. 1,217.

1. SHIPPING (§ 84*)—INJURY TO STEVEDORE—CONTRIBUTORY NEGLIGENCE.

A stevedore employed by a railroad company in discharging a coal barge was not guilty of contributory negligence in grasping spikes in the inside edge of the hatch coaming, to aid him in leaving the hold, where, on account of removal of a rope by one of the deck hands 20 minutes before, the spikes were his only means of exit, where such use of the spikes was customary, and where he tested the one, the loosening of which caused his injury, before using it.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 342; Dec. Dig. § 84.*]

2. SHIPPING (§ 84*)—INJURY TO STEVEDORE—NEGLIGENCE.

As affecting liability of a coal barge for injury to a stevedore caused by loosening of a spike in the inside edge of the hatch coaming, placed there by employés long before the accident, while he was using it as a means of leaving the hold, those in charge of the barge were negligent in failing to remove the spike or to see that it was suitable to sustain one's weight.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 350; Dec. Dig. § 84.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In·Admiralty. Libel by Harry Moore against Barge General Knox. Judgment for libelant.

Frank Healy, for libelant.

Vincent, Boss & Barnefield, for claimant.

BROWN, District Judge. The libelant, Moore, was employed as a stevedore by the New York, New Haven & Hartford Railroad Company, at its East Providence wharf, formerly known as the "Wilkesbarre Pier." The railroad company was in full control of the discharge of the coal barge General Knox.

Moore had been working as a coal shoveler in the after hatch, and about 6 p. m. September 26, 1908, was in the act of leaving the hold. In the hold was a midship stanchion, about 10x12 inches, running from the keelson to the deck beam, with iron rungs going through the beam and projecting on each side. These rungs were from 3½ to 4 inches back from and underneath the face of the hatch coaming. The distance from the top rung to the top of the inside edge of the hatch coaming was 4 feet 5 inches. In the forward side of the hatch coaming were driven two spikes—ordinary railroad spikes. Moore grasped the lower spike with his left hand, then the upper spike with his right hand, and while reaching with his left hand for the top of the hatch coaming the spike in his right hand pulled out, causing him to fall backward into the hold.

The libelant contends that the barge is responsible because the spikes formed a part of the permanent means of exit from the hold provided by the ship.

The claimant contends that the spike was not a part of the permanent structure of the ship, but says that no handholds of any description had been placed in the hatch coaming by authority of its owners or officers; that from time to time during a period of years the stevedores had driven railroad spikes into the face of this hatch coaming to make easier access to and egress from the hold; that this was not done by the authority of the owners or officers of the barge, and that the captain, when opportunity offered from time to time, was in the habit of removing the spikes, either by pulling them out or by driving them in to the head.

It is evident that the men needed some means additional to the rungs in the stanchion in order to get out of the hold. The claimant contends that a rope was a proper and sufficient means and was the means supplied by the ship for this purpose. There is evidence that during the day a rope hung in the hold and that one of the men had ascended by the use of this rope and of the spikes as a foothold. About 20 minutes before the accident, however, this rope had been removed by one of the deck hands of the barge, so that when Moore, after finishing his day's work, came up the stanchion ladder, the only means to assist him from the stanchion ladder to the top of the hatch coaming was the two spikes.

Mr. Henry F. Anthony, the superintendent of this pier for many years, testified that he had known the General Knox for over 10 years, and that during that period she had been unloaded 29 times,

and that he had observed similar spikes in her hatch coaming from time to time since he had known her, and had seen the men using these spikes without the assistance of a rope. He testified that the method of getting out of the hold of a barge by stanchion rods and spikes in the hatch coaming is a very common method, and in reference to the use of railroad spikes particularly said:

"In the older vessels, they are about all of them that way, some of these spikes driven in."

This testimony is corroborated by a number of witnesses, and the libelant has in my opinion established the fact that in the General Knox, as well as in many other wooden barges, including several other wooden barges belonging to the claimant, spikes of this character are commonly present in the hatch coamings, and are in common use by the stevedores either with or without a rope as an aid to their feet or hands in leaving the hold. Even if not a part of the original equipment, according to the testimony they became by adoption a part of the ship's permanent structure, which owners and masters well knew would probably be used by the stevedores.

In view of this testimony, which is from reputable witnesses and of a convincing character, it is evident that the present case is not one of the use of some single temporary device supplied not by the master, but by a fellow workman for a mere temporary purpose.

Conceding that these spikes were driven in during a period of years by the stevedores for their own convenience, yet it must have been obvious in view of this long-continued practice that these spikes if left in the hatch coamings would be likely to be used in connection with the stanchion rungs as a means of exit from the hold. Under such circumstances it does not seem reasonable to place a duty of inspection upon the coal shovelers, or to cast upon them the risk of injury by a defective condition of spikes in ordinary use. Reasonable care and foresight should point out the danger from permitting an appliance of this kind to be placed in the hold by one set of inexperienced laborers and continued permanently attached to the vessel for the use of other inexperienced laborers until it should give way, to the serious risk that the man using it might be precipitated into the hold.

It is not going beyond the ordinary requirement of a reasonable foresight to hold that an accident like that to Moore should have been anticipated and guarded against, either by seeing that the spikes were removed so that their presence might not invite their use, or else by seeing that they were in sound condition and suitable to sustain a man's weight when he is in a place of danger.

There is evidence that after the accident the spike was found and delivered to the superintendent of the wharf, Mr. Anthony, who produced it in court. It was a common railroad spike, much rusted and somewhat bent, and adherent to the end was wood which was practically of the color of rusty iron. The exhibit indicated by its appearance that it had been in the face of the hatch coaming for a very long time; so long that it seems hardly possible that there was

not a full opportunity for the officers of the ship to have ·determined its condition.

Following the accident an examination of the hatch coaming of the after hatch was made, and there was found one spike and a hole between two planks, indicating a place where a spike had been. At this hole the wood appeared unsound and rusty and particles of it were picked out by some of the men.

It is stated that one of the reasons why no handholds were provided was because of the danger that the digger would break any permanent handhold. There is a suggestion by the claimant that the spike may have been struck by the digger, but there is positive testimony to the contrary, and this suggestion is rather a matter of inference—and not of necessary inference—than of proof.

Reference is made, also, to the bent condition of the spike; but at what period during the long time this spike must have remained in the wood, or before it was put into the wood, the spike became bent, is altogether uncertain.

Although there may have been no appearance of unsoundness of the wood or of imperfect securing of the spike upon a casual inspection, yet something more than a casual inspection was reasonably required of spikes known not to be driven in in the course of a regular construction or repair of the barge but by unskilled laborers only concerned with a single discharge of the vessel.

Under the circumstances, and particularly having in mind the evidence as to the customary use of spikes of this character by the stevedores in leaving the hold, I am unable to find that Moore was guilty of contributory negligence. His standard of care was probably that of a man of his kind. He testifies that when he reached up he pulled down on the spike and that it seemed strong. A man leaving the dark hold of a vessel after a day's work is not in a favorable position for making a close inspection of the condition of the woodwork up which he is climbing.

I am of the opinion that the allegations of the libel are sustained, and that the injuries to Moore were occasioned by negligence of those in charge of the barge.

The question of liability is determined in favor of the libelant, and the case may stand for further hearing upon the question of the amount of damages.